IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


B.M., a Minor, by and through His Next )
Friends, ROGER MILLER and SHARON )
MILLER, and ROGER MILLER, Individually, )
and SHARON MILLER, Individually, )
           )   Case No. 11-4029-NKL
           Plaintiffs, )
           )
       v. )
           )
SOUTH CALLAWAY R-II SCHOOL )
DISTRICT, )
           )
           Defendant. )
           )

## ORDER

Pending before the Court is a Motion for the Court to Reconsider and Alter or Amend its Order and Judgment [Doc. # 88] filed by Plaintiffs Roger Miller, Sharon Miller, and B.M., through His Next Friends Roger and Sharon Miller (collectively "the Millers"). Because of new factual information identified by the Millers in their Motion for Reconsideration, and out of an abundance of caution, the Court vacates its April 12, 2012 order to the extent it granted summary judgment to South Callaway based on the Miller's failure to exhaust administrative remedies. In this limited way, Millers' Motion for Reconsideration is granted. However, considering the merits, South Callaway is still entitled to summary judgment and therefore the Millers' Motion is denied in all other respects. The Court also amends its April 12, 2012 order to incorporate the following discussion as to why summary judgment is proper on the merits.

## I.     Administrative Exhaustion

In its April 12, 2012 Order, the Court granted South Callaway's Motion for Summary Judgment because of B.M's failure to exhaust his administrative remedies. The Court based its decision on the requirement under the Individuals with Disabilities Education Act ("IDEA") that parents fulfill IDEA's exhaustion requirement when seeking relief available under the ADA and the Rehabilitation Act if the relief sought under these statutes is also available under the IDEA. *See e.g. Payne v. Peninsula School Dist.*, 653 F.3d 863, 875-76 (9th Cir. 2011) (courts should look at the complaint's prayer for relief and determine whether the relief sought is also available under the IDEA). The Court analyzed the relief sought by the Millers and concluded that most of the relief, including an order for compensatory educational services, was available under the IDEA and thus the Millers should have exhausted their administrative remedies under the IDEA before bringing their Section 504 and ADA claims before the Court.

In their initial briefing in opposition to South Callaway's summary judgment motion, the Millers argued that it would be futile for them to bring their Section 504 claims before an administrative panel because Missouri administrative panels lacked jurisdiction to hear Section 504 claims. However, the Millers presented evidence that the Missouri tribunal would be unable to hear claims presented solely as Section 504 claims. However, this is insufficient, as students eligible under both the IDEA and Section 504 would still be able to seek administrative relief by bringing claims under the IDEA, and then after exhausting their remedies, bringing 504 claims in federal court. This requirement prevents students from being able to bypass administrative review by repackaging their claims as 504 claims, and promotes the valuable interests of allowing the resolution of these matters by expert local agencies and encouraging the development of a factual

2

record before review by the district court. However, the Court also recognizes the dilemma that students face when they are not eligible under the IDEA but are still seeking relief that could be covered under the IDEA if the student were eligible. *See,* Peter J. Maher, *Note, Caution on Exhaustion: The Courts' Misinterpretation of the IDEA's Exhaustion Requirement for Claims Brought by Students Covered by Section 504 of the Rehabilitation Act and the ADA but Not by the IDEA*, 44 CONN. L. REV. 259, 277 (2011), and Mark C. Weber, *A New Look at Section 504 and the ADA in Special Education Cases*, 16 TEX. J. C.L. & C.R. 1, 24 (2010).

In the Millers' case, South Callaway found B.M. was not eligible for services under the IDEA in November of 2008, but then found B.M. eligible in August of 2009. The Court, in its initial Order, found that because B.M. was, by August 2009, a student covered under both the IDEA and Section 504, he would be required to exhaust his remedies under the IDEA. However, the Millers have belatedly submitted information suggesting that they may not have been able to submit administrative claims under the IDEA at that time. The Millers present an affidavit by Mrs. Miller stating that South Callaway determined B.M. was no longer eligible under the IDEA on September 22 or 23, 2009, and thus the Millers would have had only a little over a month to pursue an administrative hearing before the administrative panel was stripped of jurisdiction to hear the claims. [Doc. # 88 at 5]. The Millers appear to argue that they would have been prohibited from seeking administrative review in August or September 2009, under the IDEA for their claims arising before that date, ostensibly because before then, B.M. was deemed ineligible under the IDEA. Though untimely and marked by a lack of clarity, these facts and arguments raise issues as to whether administrative exhaustion under the IDEA may not apply to the Millers or in any event, may have been futile and thus should not be required. However, even if the Court were to rule that the Millers

3

do not have to exhaust their administrative remedies before bringing suit, the Millers' Motion to Reconsider still fails as the Court finds that South Callaway prevails on the merits of its summary judgment motion, as discussed below.

## II.     Summary Judgment

### A.     Relevant Facts

Below is a listing of the most relevant facts presented in the parties' summary judgment briefings. They are viewed in the light most favorable to the Millers when there is a genuine dispute of fact.[1]

#### 1)     2007-2008 School Year

1.     B.M. was referred 11 times to the principal's office during the school year. B.M. was suspended several times for various misconduct, including throwing chairs, kicking and hitting school staff, and directing obscene language towards school staff.

2.     In the fall of 2007, Mrs. Miller spoke to school principal, Mr. Elliston, about "evaluating B.M." She did not want IDEA services for B.M. but was seeking some other form of assistance. At the time Mrs. Miller was not aware that B.M. might qualify for Section 504 assistance.

_____

[1] Most of the factual disputes alleged by the Millers are supported by reference to specific portions of a post-deposition affidavit completed by Mrs. Miller. Based upon the Court's own review of Mrs. Miller's post-deposition affidavit and her original deposition testimony, it has become clear that many of the factual disputes alleged by the Millers do not actually create a genuine disputed issue of fact. The post-deposition affidavit referenced by the Millers often fail to relate specifically to the fact at issue, or even if they do relate, they fail to actually dispute the specific assertions of Defendant. In these cases, as proper under Rule 56, the Court treats the Defendant's factual assertions as undisputed.

3.  After a December 2007 suspension, Mrs. Miller met with Mr. Elliston and other staff members.  At some point around this time, Mr. Elliston informed her that she should not delay seeking psychological help for B.M, recommended counseling, and asked her about getting him on ADHD medication.  Mrs. Miller and Mr. Elliston further discussed getting an "evaluation" and "testing."  When asked if she requested a 504 or IDEA evaluation at the December 5 meeting, Mrs. Miller testified that "I didn't request an IDEA.  I requested that they find an alternative to meeting [B.M's] needs."  [Doc. # 55 at 17; Doc. # 65 at 9].

4.  Around this time, Mr. Elliston provided her with information about IDEA and a copy of the IDEA procedural safeguards as well as some paperwork to complete.  Mrs. Miller did not return the IDEA paperwork because a school employee was a relative of hers and she did not want this employee to view her family's information.  Mrs. Miller did not want the relative involved.  She contacted Mr. Elliston about her concerns. At the time, Mrs. Miller did not contact the Superintendent, Dr. Storm, about her concerns regarding the relative's involvement or about her conversations with Mr. Elliston.

5.  In February of 2008, B.M. was first diagnosed with attention deficit hyperactivity disorder after Mrs. Miller took him to the Thompson Center for an ADHD evaluation.  She did not obtain the diagnosis in writing at this time, though she reported to the Department of Education's Office of Civil Rights that she verbally provided this information to South Callaway.  Mrs. Miller explains that South Callaway never requested the report from the Thompson Center.

6.  Mrs. Miller was referred to Spring Grove Counseling after she requested options for B.M. other than medication.  B.M. was evaluated by a counselor, Kendall Grayson, and a

5

psychologist, Dr. Jeff Tarrant, at Spring Grove. Ms. Grayson's functional behavior assessment of B.M. stated, among other findings, that B.M's teacher was handling his minimal behaviors in an appropriate and effective manner. Dr. Tarrant's report diagnosed B.M. with dysthymic disorder and ruled out diagnoses of oppositional defiant disorder and ADHD until the depression was brought under control. Mrs. Miller could not recall when she received a full copy of Ms. Grayson's Functional Behavioral Assessment dated March 3, 2008, but upon receipt called and scheduled a time to meet with Mr. Elliston and other school staff. At this meeting on April 2, 2008, Mrs. Miller had the full copies of the Spring Grove reports with her though there is a dispute between the parties as to whether she gave South Callaway full copies or only partial copies. The reports were discussed at the meeting.

7.    At the end of the 2007-08 school year, B.M. was not identified as a disabled student and was not on a 504 Plan or IEP at the time. Mrs. Miller did not complete the IDEA paperwork previously provided to her nor did she contact anyone at South Callaway to ask for a special education evaluation. She did ask South Callaway to "find alternatives and address Bradley's needs with what was going on with him." [S. Miller Dep., p. 142]. She also suggested that B.M. had a disability.

### 2)    2008-2009 School Year

8.    During the 2008-2009 school year, B.M. attended fourth grade in South Callaway. From August 2008 through December 2008, B.M. had six disciplinary office referrals and was suspended several times that semester.

9.     On September 18, 2008, after one suspension. Mrs. Miller requested that South Callaway "do a 504." On this date, South Callaway documented a referral by Mrs. Miller for an IDEA

special education evaluation. Mrs. Miller testified that school officials informed her that"this is what we had to do when I asked for a 504." [S. Miller Affidavit, ¶ 158].

10. On October 13, 2008, South Callaway held a "Review of Existing Data" meeting in response to the Millers' request for an evaluation. B.M.'s counselor attended the meeting and verbally communicated that B.M. had ADHD. The documentation from the meeting references the earlier completed Functional Behavioral Assessment and notes that there were no concerns with his academics. South Callaway provided Mrs. Miller with a form entitled "Notice and Consent for Additional Assessment," which Mrs. Miller signed. Mrs. Miller wrote on the completed form that "I do not necessarily understand the need for the proposed assessment, in the interest of moving forward, I am signing my permission to conduct the assessment required." [Doc. # 55 at 32]. She and a school official discussed the proposal that B.M. be placed in a special education classroom for observation. Mrs. Miller informed the official that she didn't see how "that would do any good" because they were "trying to keep him in the regular classroom" and thus it was not clear how putting him in a special education classroom would help. [S. Miller Dep., p. 184; S. Miller Dep., Doc. 65-2, ¶ 52].

11. B.M. was again suspended twice in October for various misbehavior, including hitting a student and a teacher and using obscene language against school staff. On October 30, 2008, Mrs. Miller requested an additional evaluation under Section 504. On October 31, 2008, South Callaway provided the Millers with a "504 Notice of Action." The Notice stated that South Callaway was refusing at the time to conduct a Section 504 initial evaluation because it was then conducting an IDEA initial evaluation. The Notice further stated that if B.M. were not found eligible under IDEA, South Callaway would move forward with the

7

requested 504 evaluation. A copy of South Callaway's 504 Procedural Safeguards were provided to the Millers as well.

12.  In November of 2008, B.M. was given an in-school suspension for assault, obscene language and disruptive conduct. As a result of the incident, B.M. was handcuffed and taken to the police station. In November, Mrs. Miller requested the credentials of B.M.'s teachers and other staff members. Dr. Storm responded with these records and another copy of the IDEA procedural safeguards.

13.  On November 20, 2008, South Callaway conducted a meeting to review the IDEA initial evaluation conducted with respect to B.M. At the meeting, South Callaway informed Mrs. Miller that it did not have a written diagnosis of ADHD from Spring Grove. The team concluded that B.M. did not have a disability under IDEA. Mrs. Miller did not challenge this decision through the procedural safeguards.

14.  After this determination, Mrs. Miller made a referral for 504 eligibility and South Callaway provided her with an additional copy of her 504 rights in response. Various forms were issued and completed involving the 504 process and Ms. Grayson sent a diagnosis of ADHD in writing. On December 1, 2008, South Callaway held a meeting to discuss B.M.'s 504 eligibility. Mrs. Miller attended the meeting, where the group in attendance concluded that B.M. had a disability under 504. A plan was proposed by school officials.

15.  On December 4, 2008, South Callaway provided Mrs. Miller with a 504 Meeting Notification for a meeting for December 18, 2008, to develop the 504 Plan. Ms. Grayson sent a letter to the school that the behavior plan proposed by South Callaway would not

8

work. She also mailed a copy of the letter to the Department of Education's Office for Civil Rights (OCR) and South Callaway's Board of Education.

16. In December 2008, Mrs. Miller filed a complaint with OCR. At various times in December, South Callaway sent 504 Meeting Notifications to Mrs. Miller for the purpose of developing a 504 Plan. The meeting was rescheduled for January because Mrs. Miller informed South Callaway that the originally planned date would not work.

17. On December 18, 2008, B.M. made comments at school about shooting someone, and B.M. was taken to the sheriff's office. Mrs. Miller testified that B.M.'s therapist, Ms. Grayson, recommended that he be held out of school until his emotional state improved. At that time, the proposed 504 Plan called for him to be on a shortened school day. Mrs. Miller felt that the proposed plan was "terrible" and would have caused B.M. "increased problems." [Doc. # 65-3, ¶ 70]. The Millers did not use the 504 procedural safeguards to legally challenge the shortened school day placement. B.M. did not return to school until the beginning of March 2009.

18. On January 8, 2009, South Callaway held a team meeting to discuss B.M.'s 504 Plan, at which Mrs. Miller was present. South Callaway presented a different draft plan, which Mrs. Miller disagreed with because it proposed placing B.M. in special education and on a shortened day. Ms. Grayson said at the time that a shortened school day might work for B.M. At the meeting, Mrs. Miller rescinded her previously provided consent for South Callaway to discuss confidential information with Ms. Grayson. At this meeting, Mrs. Miller requested that B.M. be placed on homebound services. Although the 504 team did not place B.M. on homebound, his parents did so.

9

19.     In March 2009, South Callaway held another 504 meeting which Mrs. Miller attended and a 504 Plan was finalized.  After the March meeting, Mrs. Miller returned B.M. to school even though she was not satisfied with the Plan.

20.     In March 2009, OCR contacted Mrs. Miller about participating in an early complaint resolution process but Mrs. Miller refused to participate.

21.     In April 2009, B.M. had a behavioral incident at school and Mrs. Miller kept him home for approximately three weeks afterwards even though he was not suspended. When B.M. returned to school after the April incident, Ms. Grayson thought the 504 Plan South Callaway had in place was acceptable.  As a result, she recommended his return to school.

22.     From January 2009 through May 2009, B.M. had no disciplinary referrals reflected in his school records.

### 3)     2009-2010 School Year

23.     B.M. attended fifth grade in South Callaway, and during that year, South Callaway documented only one disciplinary matter for the entirety of the year for a bus incident.

24.     On August 18, 2009, South Callaway convened a team of people to revise B.M.'s 504 Plan. The 504 Plan placed B.M. on a shortened school day and included a behavior support plan. He returned to a full day placement at the end of September 2009 through the 504 Plan. B.M's behavior improved and B.M. and Mrs. Miller reported that he was "doing great" at school.

25.     Beginning in August 2009, Mrs. Miller started bringing her attorney to some 504 and IDEA meetings.

10

26.     Through the IDEA process a team concluded that B.M. was now eligible for an IEP pursuant to the IDEA. Although Mrs. Miller testified that she did not refuse consent for B.M. to receive special education services at the time, she testified that she did not sign consent for such services and understood that if she did not sign consent, South Callaway could not place B.M. in special education. She testified that "I don't know that I ever formed a decision [about B.M. having a disability under IDEA]" because "I was associating [IDEA] with being in special ed., and I don't think he needs to be in a special ed Class." [S. Miller Dep., ¶ 273]. In her post-deposition affidavit, Mrs. Miller states that she never believed B.M. was an IDEA child.

27.     Mrs. Miller could not recall if South Callaway held a 504 meeting in March 2010 to review B.M.'s 504 Plan.

### 4)     OCR Complaint

28.     Mrs. Miller's complaint to OCR made four main allegations against South Callaway: 1) that B.M. was denied a free and appropriate public education ("FAPE") because South Callaway gave him multiple out-of-school suspensions for inappropriate behavior that is a manifestation of his disability, resulting in a significant change in placement; 2) that a FAPE was denied by South Callaway's failure to implement a plan after B.M. was found eligible for Section 504 services; 3) that South Callaway failed to properly evaluate B.M. for special education and related services; and 4) that South Callaway harassed and retaliated against B.M. and his family.

29.     On May 27, 2010, the OCR rendered its decision with respect to the Millers' December 2008 complaint. The OCR found for Mrs. Miller only with respect to Allegation 1. The

11

OCR found that South Callaway used an incorrect method for determining whether a series

of suspensions created a pattern of exclusion.[2]  Use of improper procedures led South

Callaway to incorrectly deny B.M. an appropriate manifestation hearing in violation of the

regulations implementing Section 504 and Title II.

30.     The OCR did not find for Mrs. Miller with respect to any of the other allegations.

31.     As an additional finding, however, the OCR found that the notice of procedural safeguards

which were provided to Mrs. Miller did not comport with the regulations implementing

Section 504, in that the notice did not explain 1) how to file for a due process hearing; 2) that

an impartial hearing provides the opportunity for participation by parents or guardian and

representation by counsel; and 3) that a review procedure exists for actions regarding the

identification, evaluation or educational placement of persons who need or are believed to

need special education or related services.

32.     South Callaway signed a resolution agreement to resolve the issues identified in the OCR

complaint.

C.      Count I

To state a prima facie case of disability discrimination under Section 504 or the ADA, a

plaintiff must prove: (1) that he is a qualified individual with a disability; (2) he was denied the

benefits of a program or activity of a public entity receiving funds; and (3) he was discriminated

against on the basis of his disability.  *M.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 888 (8th Cir.

2008).  The Eighth Circuit also imposes upon a plaintiff a duty to establish that a defendant acted

---

[2] The OCR's report stated, "[t]he District's focus on behavior rather than the length and
impact of the series of suspensions given to the complainant's son was not consistent with the
requirements of Section 504."  [*See* Plaintiff's Ex. 1, at 10].

12

with "either bad faith or gross misjudgment." *Monahan v. State of Neb.*, 687 F.2d 1164, 1171 (8th Cir. 1982), *cert. denied, Rose v. Nebraska*, 103 S. Ct. 1252 (1983); *M.Y.*, 544 F.3d at 888. As the *Monahan* Court reasoned:

> We do not read § 504 as creating general tort liability for educational malpractice, especially since the Supreme Court... has warned against a court's substitution of its own judgment for educational decisions made by state officials. We think, rather, that either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children....The standard of liability we suggest here... reflects what we believe to be a proper balance between the rights of handicapped children, the responsibilities of state educational officials, and the competence of courts to make judgments in technical fields. So long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504.

*Id.* at 1171; *see also Heidemann v. Rother*, 84 F.3d 1021 (8th Cir. 1996) (finding that school officials did not depart grossly from acceptable standards among qualified professionals when they used a controversial blanket wrapping technique upon a handicapped student).

To satisfy this heightened standard, a plaintiff must show something more than a mere failure to provide a FAPE. *Id.* As the Eighth Circuit stated, "[t]he reference in the Rehabilitation Act to "discrimination" must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist." *Id.* Violations such as delays in providing a proper educational plan, disagreements over diagnosis or treatment, or misdiagnosing a plaintiff's disability have not been held to satisfy the bad faith or gross misjudgment standard. *See Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 529 (4th Cir. 1998) (affirming dismissal of plaintiffs' 504 claims where plaintiff asserted nothing more than a failure to timely assess and diagnose plaintiff's disability); *Hoekstra By and Through Hoekstra v. Independent Sch. Dist. No.* 283, 103 F.3d 624, 626-27 (8th Cir. 1996) (ruling that three month delay

13

in providing elevator key to physically disabled student was painful for student but did not represent bad faith or gross misjudgment); *Walker v. Dist. of Columbia*, 157 F. Supp. 2d 11, 13-14, 36 (D. D.C. 2001) (finding that school district's failure to provide a FAPE to disabled student by failing to develop an IEP one year and failing to provide a timely IEP for another year, as well as failure to provide timely due process hearing, did not demonstrate the existence of bad faith or gross misjudgment on the part of school officials).

Here, there is no evidence that South Callaway acted with either bad faith or gross misjudgment when seeking to provide B.M. with a FAPE and when addressing his behavioral problems. The undisputed facts show that Mrs. Miller met with school officials repeatedly concerning B.M.'s educational and disciplinary issues, various officials encouraged Mrs. Miller to have B.M. diagnosed, and South Callaway engaged in a lengthy process to evaluate B.M. for a disability under the IDEA, and then Section 504. Mrs. Miller was allowed to participate throughout the process. At most, the facts presented by the Millers indicate that South Callaway 1) denied B.M. a manifestation hearing by using an incorrect method to analyze B.M's suspensions; 2) provided Mrs. Miller with procedurally improper notices and at times did not explain Mrs. Miller's options to her in a way that helped her fully understood the process; and 3) failed to immediately begin to evaluate B.M. for a disability after his misbehavior started,, or after he was diagnosed in February 2008. Further, it is clear that Mrs. Miller and B.M.'s counselor, Ms. Grayson, at one point strongly disagreed with the contents of South Callaway's proposed 504 Plan for B.M. For the procedural violations, the Millers have presented no facts to indicate that this incorrect procedure, and the resulting improper denial of a manifestation determination, was done with any improper motive or purpose, or that it represented anything more than a basic error. At worst, the OCR report criticizing

14

South Callaway for its improper procedures may suggest a finding of simple negligence, rather than gross misjudgment.[3] Regarding the alleged failure of South Callaway to timely diagnose B.M. with a disability, or immediately implement a disability plan, the undisputed facts indicate that any delay was caused partly by Mrs. Miller's own failure to act, as, among other things, she did not fill out IDEA paperwork provided by South Callaway as early as late 2007 or early 2008, did not take B.M. for diagnosis until February of 2008, and did not make a request for a 504 evaluation until September of 2008, despite corresponding with school officials several times about B.M.'s situation during the previous spring semester. Any delays in final implementation of B.M.'s 504 Plan appear to be caused in part by Mrs. Miller's actions, including her withdrawal of B.M. from school and her rescheduling of meetings. However, even if South Callaway were held fully responsible for these delays, and for initially proposing a 504 Plan that was at odds with the recommendations of Mrs. Miller and B.M.'s counselor, mere evidence of delays in recognition of a disability, in implementing an appropriate plan, or even in affirmatively proposing a flawed educational plan are insufficient to satisfy the bad faith/gross misjudgment standard.

The Millers argue that it is a question for the jury as to whether South Callaway acted with bad faith or gross misjudgment. However, this would only be the case if there were any genuine issue of material fact here for the jury to decide. None of the Millers' numerous submissions in this case present a dispute of fact which, if interpreted in favor of the Plaintiffs, could establish a

---

[3] In a footnote to its report, the OCR indicates that even if it were proper for South Callaway's procedure to consider whether the misconduct behind the different suspensions represented similar behavior,"it is not clear how [B.M's] acts of throwing a chair at a student, kicking the principal in the shins, hitting another student, hitting a teacher and kicking another staff member within a two-month period would not be considered a pattern of similar behavior of aggression toward others." [See OCR Report, Plaintiff's Ex. 65-1, at 9].

15

showing that South Callaway's procedural violations and delays represented bad faith or gross misjudgment, given the totality of the facts alleged by the Millers.

### D. Count II

Count II of Plaintiffs' Complaint is brought under the ADA and Section 504 in the names of Roger and Sharon Miller, the parents of B.M. South Callaway seeks dismissal of Count II based on the argument that the Millers lack standing to bring a claim. As discussed in the original order, there is a split with regard to whether parents have standing in their own right under the Rehabilitation Act and the ADA. *Compare M.W. ex rel. Williams v. Avilla R-XIII School District*, 2011 WL 3354933 (W.D. Mo. 2011) (finding that the parents lacked standing to pursue claims under § 504 and the ADA because neither statute "contemplate[s] damage claims by individuals who do not themselves have disabilities nor have suffered discrimination based on their own disabilities."); with *K.F. v. Francis Howell R-III School Dist.*, 2008 WL 723751, at *7 (E.D. Mo. 2008) (finding that parents have standing under § 504 and the ADA because of "the 'particular and personal' interest parents have in preventing discrimination against their child."). However, the Court need not decide the standing issue, for even if parents are deemed to have standing, the Millers have failed to present facts indicating any 'bad faith/gross misjudgment' by South Callaway towards either B.M. or his parents, which is a required element of Plaintiffs' ADA and Section 504 claims.

### III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for the Court to Reconsider and Alter or Amend its Order and Judgment [Doc. # 88] is hereby DENIED except as it relates to the issue of administrative exhaustion.

16

s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated:  July 23, 2012
Jefferson City, Missouri

17